**"Exhibit C"**

**(Purchase and Sale Agreement)**

## AGREEMENT OF PURCHASE AND SALE

THIS **AGREEMENT OF PURCHASE AND SALE** ("Agreement") is made and entered into this __27__ day of November, 2017 (the "**Execution Date**") by and between Pittsburgh Athletic Association Land Company (the "**PAALC**"), a Pennsylvania corporation, and Pittsburgh Athletic Association (the "**PAA**"), a Pennsylvania non-profit corporation (collectively referred to as "**Seller**"), having an address of 4215 Fifth Avenue, Pittsburgh, PA 15213, and WALNUT PAA, LP, a Pennsylvania limited partnership and WALNUT CAPITAL ACQUISITIONS, INC., a Pennsylvania corporation (collectively, the "**Purchaser**"), having an address of 5500 Walnut Street, Suite 300, Pittsburgh, PA 15232.

### RECITALS:

PAALC owns those certain parcels of real estate located in 4th Ward of the City of Pittsburgh, Allegheny County, Commonwealth of Pennsylvania, more particularly described on Exhibit A, known as the "Hotel Parcel" (Allegheny County Block and Lot No. 27-R-110) better known as 5126 Bigelow Boulevard, Pittsburgh, Pennsylvania 15213 and the "Club Parcel" (Allegheny County Block and Lot No. 27-R-138) better known as 4215 Fifth Avenue, Pittsburgh, Pennsylvania 15213 (the Hotel Parcel and the Club Parcel together with all rights, easements, and appurtenances thereto are collectively referred to as the "**Real Property Assets**").

Subject to the terms and provisions hereof, and for the considerations set forth in this Agreement, Seller has agreed to sell the Assets (as hereinafter defined) to Purchaser, and Purchaser has agreed to buy the Assets from Seller.

NOW, THEREFORE, the parties hereto, with the intent to be legally bound, hereby agree as follows:

1. Definitions. As used in this Agreement, the following terms have the following meanings:

   Assets. The Real Property Assets, the Ground Lease and any personal property assets of the Debtors incidental to the Real Property Assets which are not part of the Excluded Assets.

   Bankruptcy Case. The proceedings before the Bankruptcy Court at Case Nos. 17-22222-JAD and 17-22223-JAD as Jointly Administered.

   Bankruptcy Court. The United States Bankruptcy Court for the Western District of Pennsylvania.

   Closing. The closing of the transaction contemplated herein.

   Closing Date. The Closing Date shall occur within thirty (30) days after the entry of an Order Confirming the Plan (as hereinafter defined) has become final and non-appealable.

Escrow Company. The Title Company as defined below.

Excluded Assets. The following assets which are being retained by the Seller: (a) all of the art, china, dishware, furniture, linens, silver, and/or any other equipment, furnishings, memorabilia, and/or tangible assets located in the Real Property Assets; (b) all intellectual property owned by the Seller including, branded materials, copyrights, trademarks, and service marks; (c) Pennsylvania liquor license known as Liquor License CC-1/LID No. 2815; (d) all claims and actions arising under the United States Bankruptcy Code Chapter 5; (e) any contracts, including employment and/or labor agreements, entered into by the Seller; and (f) all legal claims or causes of action accrued prior to the Seller filing the Bankruptcy Case including, but not limited to, any professional malpractice claims. Notwithstanding the foregoing, the Seller shall grant the Purchaser an irrevocable license at Closing to utilize the "PAA" name associated with the Building, and an irrevocable license to utilize the "PAA" logo associated with the Building as well as the decorative engravings and claddings on the exterior façade.

Ground Lease. The Lease between the Seller and Oakland Fifth Avenue Hotel Associates, L.P. dated January 30, 2015, as amended.

Plan. The Disclosure Statement and Bankruptcy Plan of Reorganization prepared jointly by the Seller and Purchaser for Confirmation by the Bankruptcy Court inclusive of any amendments filed in connection therewith.

Title Company. Chicago Title Insurance Company.

2. Sale; Purchase Price.

2.1 Subject to (a) the terms and provisions hereof and (b) the entry of a final and non-appealable Order Confirming the Plan by the Bankruptcy Court, Seller agrees to sell and convey the Assets to Purchaser, and Purchaser agrees to purchase the Assets from Seller.

2.2 Purchaser shall pay the sum of Eleven Million Nine-Hundred and Thirteen Thousand and 00/100 Dollars ($11,913,000.00) (hereinafter called the "**Purchase Price**") to Seller for the Assets. The Parties agree that the Purchase Price has been allocated as follows: (a) Two-Million and 00/100 Dollars ($2,000,000.00) has been allocated to the Hotel Parcel; and (b) Nine-Million Nine-Hundred Thirteen Thousand and 00/100 Dollars ($9,913,000.00) has been allocated to the Club Parcel. The Purchase Price shall be payable in the following manner:

(a) Purchaser shall deposit with the Escrow Company the amount of One-Million and 00/100 Dollars ($1,000,000.00) (together with all interest earned thereon, the "**Earnest Money Deposit**") on the Execution Date. The Earnest Money Deposit shall be in the form of a wire transfer of immediately available funds. The Earnest Money Deposit shall remain with the Escrow Company until the entry of a final non-appealable Order Confirming the Plan. Subject to the Seller's fulfillment and satisfaction of the Conditions Precedent To Closing as set forth in Section 4 below, the Earnest Money Deposit shall be nonrefundable to Purchaser. In the event that Seller has not satisfied the Conditions Precedent To Closing as set forth in Section 4 below, and Purchaser has not waived the same, Purchaser shall be entitled to a refund of its

Earnest Money Deposit. Specifically, in the event that the Plan is not confirmed by the Bankruptcy Court for any reason, the Earnest Money Deposit shall be refunded to the Purchaser and, upon such return, this Agreement and all rights and obligations of the respective parties hereunder shall be null and void except for such matters which are stated to specifically survive Closing and delivery of the Deed (the "Surviving Obligations"). At the Closing, the Earnest Money Deposit shall be applied to the Purchase Price to be paid by Purchaser at the Closing. In the event of a default hereunder by Purchaser or Seller, the Earnest Money Deposit shall be tendered as provided herein.

(b) Purchaser shall pay the balance of the Purchase Price at the Closing, subject to the prorations described in Section 5 below, in cash (the "**Cash Balance**") by wire transfer of immediately available funds to the Title Company in accordance with the terms and conditions of this Agreement.

3.  Seller Deliverables, Inspections, and Diligence.

3.1 Seller Deliverables. Within seven (7) days following the Execution Date, Seller shall deliver, or make electronically available, to Purchaser complete copies of the following items pertaining to the Assets (collectively the "**Seller Deliverables**"), to the extent in Seller's actual possession: (a) all leases, occupancy agreements, and amendments, modifications, and supplements thereto related to the Assets; (b) all service contracts, equipment leases, and other agreements related to the operation of the Assets; (c) all architectural plans, building files, building plans, CAD drawings, environmental studies, surveys, and/or reports pertaining to the Assets, and (d) list of any pending or threatened litigation except for the Bankruptcy Case.

3.2 Inspections. From the Execution Date, Purchaser shall have the right to conduct various investigations, studies and reviews of the Assets, including architectural, environmental, engineering, and feasibility studies of the property, at such reasonable times and on terms and conditions to be mutually acceptable to Purchaser and Seller. Purchaser agrees to indemnify, defend and hold the Seller harmless from any and all liability and/or damages arising from such access and studies of the Assets and activities associated therewith. Prior to commencement of any and all activities on the Real Property Assets, Purchaser shall obtain, or cause its consultants to obtain, at Purchaser's sole cost and expense, a policy of commercial general liability insurance covering any and all liability of the parties with respect to or arising out of any investigative activities upon the Real Property Assets. Such policy of insurance shall (x) be kept and maintained in force during the term of this Agreement and so long thereafter as necessary to cover any claims of damages suffered by persons or property resulting from any acts or omissions of Purchaser, Purchaser's employees, agents, contractors, suppliers, consultants or other related parties, (y) have liability limits of not less than Two Million Dollars ($2,000,000.00) combined single limit per occurrence for bodily injury, personal injury and property damage liability, and (z) designate the Seller as an "Additional Insured". In the event that Purchaser damages the Real Property Assets in any manner, Purchaser shall promptly repair the same to its previous condition at Purchaser's sole expense. The indemnification and repair obligations of Purchaser herein shall survive Closing.

3.3 Title and Survey. Purchaser shall, at Purchaser's sole cost and expense, obtain a commitment for an ALTA owner's policy of title insurance, along with a copy of each

BANK_FIN 576562-1 032279-180169

3

instrument listed as an exception thereon (the "**Title Commitment**"), on the Real Property Assets issued by the Title Company. Purchaser shall have the right to obtain, at its sole cost and expense, any desired endorsements to the Title Commitment that are available. Purchaser may obtain, at Purchaser's sole cost and expense, a current survey of the Real Property Assets (the "**Survey**") and shall deliver the same to Seller as soon as reasonably practicable after the same has been completed. The Purchaser shall, within thirty (30) days of the Execution Date (the "**Title Review Period**"), make an examination of the Title Commitment and Survey and the make any objections thereto (the "**Title Objections**"), said objections to be made in writing (the "**Title Objection Notice**") and delivered to Seller, along with copies of appropriate exception documents, on or before the expiration of the Title Review Period. If Purchaser fails to timely deliver the Title Objection Notice on or before the expiration of the Title Review Period, Purchaser shall be deemed to have accepted all exceptions to the Title Commitment and the form and substance of the Survey and all matters shown thereon. The Ground Lease and any exceptions and matters on the Title Commitment and/or the Survey not objected to by Purchaser pursuant to the Title Objection Notice and any exceptions or matters caused by or through Purchaser shall be included in the term "**Permitted Exceptions**" as used herein. Seller shall, within five (5) days of receipt by Seller of the Title Objection Notice, give notice to Purchaser as to which, if any, of the Title Objections set forth in the Title Objection Notice, that Seller will not commit to cure at or before the Closing (the "**Seller's Statement**") subject to the Bankruptcy Court's approval of the Plan. Failure to timely deliver the Seller's Statement shall conclusively be deemed to mean that Seller will not cure at or before the Closing all Title Objections set forth in the Title Objection Notice. If Seller timely delivers a Seller's Statement advising that it will not cure all of the Title Objections listed in the Title Objection Notice, then Purchaser's sole right shall be to either (i) waive such Title Objections and proceed to Closing without reduction of the Purchase Price, or (ii) terminate this Agreement by giving notice thereof to Seller within three (3) days of Purchaser's receipt of the Seller's Statement. If Purchaser elects to terminate this Agreement, the Earnest Money Deposit shall be returned to Purchaser, and upon such return, except for the Surviving Obligations, this Agreement and all rights and obligations of the respective parties hereunder shall be null and void. If Purchaser does not notify Seller of its election to terminate this Agreement, Purchaser shall conclusively be deemed to have waived its right of termination on account of such Title Objections and will proceed to Closing without adjustment to the Purchase Price. Notwithstanding anything set forth to the contrary herein, subject to the approval of the Bankruptcy Court, Seller shall, as a condition to settlement, be required to satisfy, discharge and/or remove as title exceptions all mortgages, liens, and judgments not caused by or through Purchaser and encumbering the Real Property Assets that can be removed solely upon payment of a sum certain and such items shall in no event be deemed Permitted Exceptions. The parties agree that, subject to the approval of the Bankruptcy Court, the result of the Plan will be that the PAALC will acquire marketable title to the Real Property Assets free and clear of any encumbrances except Permitted Exceptions.

4.  Closing; Conditions; Deliveries.

    4.1  Place of Closing. The Closing shall be held on the Closing Date in the offices of the Title Company or at any other location mutually acceptable to the parties.

4.2 Condition to Parties' Obligation to Close.

(a) The obligation of the Purchaser to close on the sale of the Assets shall be expressly subject to the satisfaction of the following conditions:

(i) The Bankruptcy Court shall have entered a final and non-appealable Order Confirming the Plan.

(ii) The Title Company shall have provided a Title Commitment to the Purchaser which confirms, after the payment of the creditors and allowed claims as part of the Plan, that the title to the Real Property Assets shall be marketable (other than the Ground Lease), and that the title to the Real Property Assets will be insured at standard market rates subject only to the Permitted Exceptions.

(iii) The Seller, and anyone claiming occupancy rights through the Seller (with the exception of the Ground Lease), shall have vacated the Real Property Assets.

(iv) Intentionally Omitted.

(v) The Seller shall have terminated all service contracts, equipment leases, and other agreements related to the operation of the Real Property Assets. It is the express intent of the parties that the Purchaser shall not be obligated to assume any contracts of Seller.

(vi) The Seller shall have terminated, or shall have expressly assumed responsibility of any employment agreements or union contracts related to the Seller's operations of the Hotel Parcel and/or the Club Parcel. It is the express intent of the parties that the Purchaser shall not be obligated to assume any of the employment agreements or union contracts entered into by the Seller, and that such agreements remain solely the obligation of the Seller.

(vii) The Seller shall have provided an Estoppel Certificate from Oakland Fifth Avenue Hotel Associates, L.P., dated no more than twenty (20) days prior to the Closing Date, which confirms that the Ground Lease is in full force and effect, that there are no defaults, and further certifying such other commercially reasonable terms as may be required by the Purchaser or its lender.

(viii) The Parties shall have agreed upon the final form of the Declaration of Condominium and LP Agreement (as both are defined below).

The Purchaser may waive, in its sole and absolute discretion, any of the conditions set forth in Paragraph 4.2(a)(ii)-(viii) above.

(b) The obligation of the Seller to close on the Assets shall be expressly subject to the satisfaction of the following conditions:

(i) The Bankruptcy Court shall have entered a final and non-appealable Order Confirming the Plan.

(ii) The Parties shall have agreed upon the final form of the Declaration of Condominium and LP Agreement (as both are defined below).

4.3 Deliveries. At Closing each party shall execute and deliver to the other and/or the Escrow Company the following documents:

(a) Seller shall deliver to Purchaser and/or the Title Company: (i) a special warranty deed to the Real Property Assets (the "**Deed**") conveying title to the Hotel Parcel and the Club Parcel, subject only to the Permitted Exceptions; (ii) a Bill of Sale conveying title to the Purchaser to any personal property or intangible property specifically included pursuant to this Agreement; (iii) an assignment and assumption of the Ground Lease; (iv) a fully executed original Declaration of Condominium consenting to the creation of the "PAA Condominium" as more particularly described in Section 6 below; (v) a fully executed limited partnership agreement as more particularly described in Section 6 below; (vi) a non-foreign transferor certification pursuant to Section 1445 of the Internal Revenue Code and any similar provisions of applicable state law; (vii) a certified resolution of Seller certifying that Seller has the legal power, right and authority to consummate the sale of the Property; (viii) the original Ground Lease, if in possession of Seller; (ix) keys to the Club Parcel; (x), possession of the Club Parcel and free and clear of the Excluded Assets (which shall be removed at the sole cost and expense of the Seller), and (xi) such other documents as may be reasonably and customarily required by the Title Company to consummate the Closing. All documents required to be delivered by Seller shall be in form and substance as satisfactory to Seller in its commercially reasonable discretion.

(b) Purchaser shall deliver to Seller or the Title Company: (i) the Cash Balance, (ii) Purchaser's counterparty signature, as may be required, to the documents set forth in Section 4.3(a) above; (iii) a certified resolution of Purchaser certifying that Purchaser has the legal power, right and authority to consummate the purchase of the Assets, (iv) the Declaration of Condominium (as defined below); and (v) the Condo Deed (as defined below).

(c) Seller and Purchaser shall jointly deliver to the Title Company: (i) a closing statement; (ii) all transfer declarations or similar documentation as required by law; and (iii) such other documents as may be reasonably and customarily required by the Title Company to consummate the Closing.

5. Closing Costs and Prorations.

5.1 Closing Costs. The parties agree to the following with regard to Closing Costs:

(a) Seller shall pay Seller's legal fees and expenses, including costs associated with the Bankruptcy Case, preparation of the conveyance documents and Deed; the cost of recording any instruments required to discharge any liens or encumbrances against the Assets that Seller is obligated hereunder to discharge; the cost of municipal lien and zoning letters; and fifty percent (50%) of all reasonable settlement fees not to exceed $300.00.

(b) Purchaser shall pay the costs of the Survey (if any); the costs for any endorsements to the title policy; the cost of the title policy and related searches; fifty percent (50%) of all reasonable closing escrow fees; the fee for the recording of the Deed and the Condo Deed; all costs and expenses incurred in connection with the transfer of any transferable permits, warranties or licenses in connection with the ownership or operation of the Assets; all costs and expenses associated with Purchaser's financing, if any; Purchaser's legal fees and expenses; fifty percent (50%) of all reasonable closing escrow fees; and fifty percent (50%) of all reasonable settlement fees.

(c) The parties agree to equally split the real estate transfer taxes and stamps associated with the conveyance of Real Property Assets via recording of the Deeds. However, the parties expressly agree that they will expressly provide in the Plan that such conveyance of Real Property Assets shall be exempt from the imposition and assessment of real estate transfer taxes pursuant to 11 U.S.C. §1146(a) for the real estate transfers contemplated herein.

5.2 Prorations. All real estate taxes for the applicable tax year shall be prorated as of the Closing Date based on the applicable fiscal year of each taxing body. It is the express intent of the parties that the Seller shall be responsible for all real estate taxes accrued for taxes years prior to the applicable tax year of the Closing, and that the Purchaser be responsible for all real estate taxes accrued for tax years after the applicable tax year of the Closing.

6. Operating Covenants.

6.1 The Parties agree to the following operational covenants prior to the Closing:

(a) Building Operations. The Seller will (i) maintain insurance on the Real Property Assets; (ii) maintain temporary heat in the Club Parcel; and (iii) keep the Real Property Assets secured.

(b) Creation of Declaration of Condominium. The parties will jointly work in good faith and with best efforts to develop a form of Declaration of Condominium which will create the following:

(i) Dedicated Fitness Facilities. The parties will design a space within the Club Parcel to develop a first class fitness facility (the "**Fitness Facility**"). The Fitness Facility will comprise approximately 12,000 square feet of space on the lower levels and will include fitness machines, weights, yoga studios, showers, locker rooms (male and female) and similar amenities for the exclusive use if the PAA's members (the "**FF Condominium Unit**"). The PAA's members shall have the exclusive right to use the Fitness Facility, provided however that the PAA shall make either discounted memberships and/or special memberships available to the other tenants of the Club Parcel and/or their employees with such fees being jointly established by the Seller and Purchaser. The Seller shall not be required to contribute any capital dollars for the initial construction of the Fitness Facility or the initial amenities located therein. Purchaser also intends to install a lap pool as part of the fitness facilities which may be used by the PAA's members. The Seller and/or PAA shall not be required to contribute any capital dollars for the construction of the lap pool.

7

(ii) <u>Squash Courts</u>. The parties shall leave in place the existing doubles squash court, and Purchaser shall construct a regulation singles squash court for the use of the PAA's Members. The existing doubles court shall be delivered "as is", and shall be maintained, repaired and/or replaced by the Seller after redevelopment by Purchaser is complete. If Purchaser relocates the doubles squash court, the relocated doubles squash court shall be regulation size and shall not be included in the square footage of the fitness facility as set forth in Section 6.1(b)(i) above. The squash courts wherever located shall be part of the FF Condominium Unit.

(iii) <u>Social Facilities</u>. The parties will design the Building so that the PAA's Members shall have the exclusive right to use the "Grille Room" for their membership's activities and gatherings which shall be a separate condominium unit (the "**Grille Condominium Unit**" and together with the FF Condominium Unit, the "**Condominium Units**"). The Purchaser shall provide the Grille Room with access to the Building's updated mechanical and utility systems at Purchaser's exclusive cost. If Purchaser replaces the Building's exterior windows, Purchaser will also replace any exterior windows in the Grille Room, so long as the same is structurally feasible, with the same exterior replacement windows at Purchaser's exclusive cost. The Seller shall be responsible for the cleaning, janitorial, maintenance, and operational costs of the Grille Room after completion of the redevelopment by Purchaser and delivery of possession of the Condominium Units to PAA. The Seller will also be responsible for providing furniture, fixtures, and equipment for the same.

(c) In the event that the parties are unable to agree on the form of the Declaration of Condominium, then the Purchaser shall provide the Seller with a written "Notice of Intent to Terminate". The Parties shall have thirty (30) days from the delivery of the Notice of Intent to Terminate to work cooperatively to resolve any issues between them. If the Parties cannot resolve their issues within such thirty (30) day period, then the Purchaser shall have the right to either (1) delay the Closing until such time as the parties can agree on the form of such Declaration of Condominium, or (b) to terminate this Agreement and receive a refund of its Earnest Money Deposit, and upon the issuance of such refund, neither party shall have any further obligation to the other, except for the Surviving Obligations, if any.

6.2 The Parties agree to the following operational covenants post Closing:

(a) <u>Building Operations</u>. The Purchaser shall be responsible to (i) maintain insurance on the Real Property Assets; (ii) maintain utilities to the Club Parcel; and (iii) keep the Real Property Assets secured.

(b) <u>Temporary Facilities</u>. Purchaser agrees to use good faith and commercially reasonable efforts to work with the Seller to find temporary fitness and social facilitates for the PAA's members during the construction and renovation of the Building. PAA's members shall be responsible for any fees assessed by such facilities for the usage. Purchaser agrees to use good faith and commercially reasonable efforts to locate these temporary facilities as close to the Building as possible.

(c) <u>Office Space</u>. Upon the completion of the Purchaser's renovations of the Building, the PAA shall have the right via an exclusive and irrevocable license, at no cost to the Seller, to occupy a dedicated office space in the Building of approximately 800 square feet,

which is to be used for membership services and operations. The Seller shall be responsible for the costs of the furniture, fixtures and equipment for the same. The Seller shall also be responsible for any janitorial service for the same after Purchaser's redevelopment and delivery of possession of the Office Space to the PAA. The Parties acknowledge that the Purchaser shall have the right to relocate the Office Space from time to time, at Purchaser's expense, in order to accommodate the Purchaser's space needs or needs of other tenants so long as the Seller maintains the same size and character of Office Space. The Seller reserves the right to configure its office space as it sees fit in cooperation with the Purchaser during the Redevelopment.

(d)    Parking. Purchaser shall use good faith, but commercially reasonable efforts, to provide parking for the PAA's members in the adjacent hotel garage for use by the PAA's Members while they are located in the Building. Such parking will be available at market rates established by the garage from time to time.

(e)    Excluded Assets. The Seller, at its sole cost and expense, shall be responsible for the removal of any Excluded Assets which it desires to keep. The Purchaser will not be liable for any damages to any Excluded Assets, property, and/or valuables left by the Seller and/or PAA on or in the Property after the Closing Date.

6.3    Joint Venture \ Profit Sharing. The parties agree that the Seller shall not be required to contribute any capital to the renovation and/or operation of the Club Parcel except as provided in this Section 6 of this Agreement, and/or as further set forth in the Declaration of Condominium Documents. In addition, the Seller and/or PAA shall not be required to guaranty any debt associated with Purchaser's redevelopment of the Club Parcel. At the Closing, the Purchaser and PAA will execute a limited partnership agreement (the "**LP Agreement**") which will provide that PAA shall be given a five percent (5%) limited partnership interest in the Purchaser, or the Purchaser entity acquiring the Assets. The Seller's interest will entitle the Seller to receive five percent (5%) of the net cash flow from the Assets' operations (after making provisions for appropriate capital reserves and expenses), and after a cumulative preferred return of nine percent (9%) to the partners contributing equity dollars to the Purchaser.

6.4    Conveyance of Condominium. At the Closing, the Purchaser shall either (a) convey the Condominium Units to the PAA or (b) provide the Condo Deed to the Title Company for the Title Company to hold in escrow pending the issuance of the Certificate of Occupancy for the FF Condominium Unit and the Grille Condominium Unit. In all events, the condominiums shall be conveyed for $1.00 via a special warranty deed (the "Condo Deed"), subject to the covenants and restrictions contained in the Declaration of Condominium and title matters of record as of the Execution Date, but otherwise free and clear of all encumbrances.

6.5    Survival. The terms, conditions and obligations set forth in this Section 6 shall survive Closing.

7.    "AS IS" "WHERE IS" PURCHASE. By Closing the transaction contemplated by this Agreement, Purchaser acknowledges that it had the opportunity to investigate all physical and economic aspects of the Assets and to make all inspections and investigations which Purchaser deemed necessary or desirable to protect its interests in acquiring the Assets including a review

9

of the Seller Deliverables; the condition of title; engineering and structural tests, soils reports, and other tests or investigations which Purchaser may choose to make. Furthermore, Buyer acknowledges that, except as otherwise expressly set forth in this Agreement, (i) neither Seller, PAA, nor anyone acting for or on behalf of Seller or PAA, has made any representation, warranty, promise or statement, express or implied, to Purchaser, or to anyone acting for or on behalf of Purchaser, concerning the Assets, (ii) in entering into and Closing this Agreement, Buyer has not relied on any representation, warranty, promise or statement, express or implied, of Seller, PAA or anyone acting for or on behalf of Seller or PAA and (iii) **AS A MATERIAL INDUCEMENT TO THE EXECUTION AND DELIVERY OF THIS AGREEMENT BY SELLER, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS AGREEMENT, PURCHASER IS PURCHASING THE ASSETS IN AN "AS IS" PHYSICAL CONDITION AND IN AN "AS IS" STATE OF REPAIR, WITH ALL FAULTS.**

8.    Commissions. Purchaser agrees to be responsible to pay a brokerage \ advisory fee of $325,000.00 to HFF, LP at the Closing. Seller and Purchaser each warrant and represent to the other that other than HFF, neither has had any dealings with any broker, agent, or finder relating to the sale of the Assets or the transactions contemplated hereby. Each party agrees to indemnify and hold the other harmless against any claim for brokerage commissions, compensation or fees by any broker, agent, or finder in connection the sale of the Assets or the transactions contemplated hereby resulting from the acts of the indemnifying party. The provisions of this Section shall survive Closing or any termination of this Agreement.

9.    New York Style Closing. It is contemplated that the transaction shall be closed by means of a so-called New York Style Closing, with the concurrent delivery of the documents of title, transfer of interest, delivery of the pro forma title policy or marked-up title commitment and the payment of the Purchase Price. Seller and Purchaser also agree that disbursement of the Purchase Price, as adjusted by the prorations, shall not be conditioned upon the recording of the Deed, but rather, upon the agreement by the Title Company to issue the title policy. Seller and Purchaser shall each provide any undertaking to the Title Company reasonably necessary to accommodate the New York Style Closing.

10.    Attorneys' Fees and Costs. In the event suit or action is instituted to interpret or enforce the terms of this Agreement, or related to the transaction described herein or any documents pertaining thereto, or in connection with any arbitration or mediation of any dispute, the prevailing party shall be entitled to recover from the other party such sum as the court may adjudge reasonable as such party's costs and attorney's fees, including such costs and fees as are incurred in any trial, on any appeal, in any bankruptcy proceeding (including the adjudication of issues peculiar to bankruptcy law) and in any petition for review. The provisions of this Section shall survive Closing or any termination of this Agreement.

11.    Notice. All notices, demands, deliveries and communications (a "Notice") under this Agreement shall be delivered or sent by: (a) registered or certified mail, postage prepaid, return receipt requested, (b) nationally recognized overnight carrier, or (c) facsimile or email with original Notice sent via overnight delivery addressed to the address of the party in question set

forth in the first paragraph of this Agreement and copies to the parties designated below or to such other address as either party may designate by Notice pursuant to this Section 11.

| | |
|---|---|
| Notices to Seller: | Pittsburgh Athletic Association Land Company<br>c/o of the Pittsburgh Athletic Association<br>4215 Fifth Avenue<br>Pittsburgh, Pennsylvania 15213<br>Attn: James A. Sheehan, President |
| With copy to: | Pittsburgh Athletic Association Land Company<br>4215 Fifth Avenue<br>Pittsburgh, Pennsylvania 15213<br>Attn: James A. Sheehan, President<br><br>AND<br><br>Jordan S. Blask, Esquire<br>Tucker Arensberg, P.C.<br>1500 One PPG Place<br>Pittsburgh, Pennsylvania 15222 |
| Notices to Purchaser: | Todd E. Reidbord, President<br>PAA Walnut, LP<br>C/O Walnut Capital Acquisitions, Inc.<br>5500 Walnut Street, Suite 300<br>Pittsburgh, PA 15232. |
| With copy to: | Jonathan M. Kamin, Esquire<br>Goldberg, Kamin & Garvin, LLP<br>1806 Frick Building, 437 Grant Street<br>Pittsburgh, PA 15219<br><br>David K. Rudov, Esquire<br>Rudovlaw<br>1806 Frick Building, 437 Grant Street<br>Pittsburgh, PA 15219 |

12. Fire or Other Casualty; Condemnation.

12.1 If the Assets are damaged by fire or other casualty prior to the Closing Date and such damage would cost in excess of $250,000.00 to repair (as determined by an insurance adjuster selected by the insurance carriers), Purchaser may terminate this Agreement by written notice to Seller given on or before the earlier of (a) twenty (20) days following such casualty or (b) the Closing Date. In the event of such termination, this Agreement shall be of no further force and effect and, except for the Surviving Obligations, neither party shall thereafter

have any further obligation under this Agreement, and Seller shall direct the Escrow Company to promptly return all Earnest Money to Purchaser. If Purchaser does not elect to terminate this Agreement or the cost of repair is determined by said adjuster to be less than $100,000.00, then the Closing shall take place as herein provided without abatement of the Purchase Price, and Seller shall assign and transfer to Purchaser on the Closing Date, without warranty or recourse, all of Seller's right, title and interest to the balance of insurance proceeds paid or payable to Seller on account of such fire or casualty remaining after reimbursement to Seller for the total amount of all costs and expenses incurred by Seller in connection therewith, including, but not limited to, making emergency repairs, securing the Assets and complying with applicable governmental requirements. Seller shall credit to Purchaser at Closing the amount of the deductible of any of Seller's applicable insurance policies.

        12.2 If any portion of the Real Property Assets which makes the Building unusable is taken in eminent domain proceedings prior to Closing, Purchaser may terminate this Agreement by notice to Seller given on or before the earlier of (a) twenty (20) days after such taking or (b) the Closing Date, and, in the event of such termination, this Agreement shall be of no further force and effect and, except for the Surviving Obligations, neither party shall thereafter have any further obligation under this Agreement, and Seller shall direct the Escrow Company to promptly return all Earnest Money to Purchaser. If Purchaser does not so elect to terminate or if the taking is not material, then the Closing shall take place as herein provided without abatement of the Purchase Price, and Seller shall deliver or assign to Purchaser on the Closing Date, without warranty or recourse, all of Seller's right, title and interest in and to all condemnation awards paid or payable to Seller.

13.    Sewage Facility. The Pennsylvania Sewage Facilities Act of January 24, 1966, No. 537 P.L. 1535, as amended, requires that there be a statement regarding the availability of a community sewage system. Seller represents that the Club Parcel is serviced by a community sewage system.

14.    Assignment. Purchaser may assign this Agreement to an affiliate of Purchaser without Seller's consent so long as Purchaser remains fully liable for the performance of all of the obligations set forth herein. Any other assignment shall require the Seller's consent which Seller may withhold in Seller's sole discretion. Purchaser shall be solely responsible for and indemnify and hold harmless Seller from and against any and all realty transfer taxes assessed due to any such assignment or transfer of interest in this Agreement. Notwithstanding anything to the contrary, upon any assignment by Purchaser, Purchaser shall not be relieved of any obligations hereunder.

15.    Default and Remedies.

        15.1 Seller Default. Subject to the approval of the Bankruptcy Court, in the event that Seller shall fail to consummate any of its obligations under this Agreement and fails to cure the same within thirty (30) days of written notice, then Purchaser may elect (a) to bring an action against Seller for specific performance under this Agreement, or (b) terminate this agreement and receive a refund of the Earnest Money Deposit paid by Purchaser plus Purchaser's out of pocket expenses not to exceed One Hundred Thousand and 00/100 Dollars ($100,000.00).

15.2 Purchaser's Default. In the event of a default by Purchaser, which remains uncured after thirty (30) days written notice, Seller, as its sole and exclusive remedy, may terminate this agreement and receive the Earnest Money Deposit, and upon the payment of such Earnest Money Deposit, neither party shall have any further obligation to the other except for the Surviving Obligations.

16. Miscellaneous.

16.1 Entire Agreement. This Agreement, including the attached exhibit, constitutes the entire understanding of the parties. All prior agreements, understandings, representations and statements, oral or written, are hereby merged herein. In the event of a conflict between the terms of this Agreement and any prior written agreements, the terms of this Agreement shall prevail. This Agreement may only be amended or modified by an instrument in writing, signed by the parties.

16.2 Time. If the time for performance of any obligation hereunder shall fall on a Saturday, Sunday or holiday (National or in the Commonwealth of Pennsylvania) such that the obligation cannot be performed, the time for performance shall be extended to the next such succeeding day where performance is possible.

16.3 Counterpart Execution. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original. The Parties agree to recognize electronic (ie PDF) signatures as being binding upon them

16.4 Governing Law. THIS AGREEMENT SHALL BE DEEMED TO BE A CONTRACT MADE UNDER, GOVERNED BY AND INTERPRETED IN ACCORDANCE WITH THE LAWS OF THE COMMONWEALTH OF PENNSYLVANIA. AFTER THE ENTRY OF AN ORDER BY THE BANKRUPTCY COURT CLOSING THE BANKRUPTCY CASE, THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA SHALL HAVE EXCLUSIVE JURISDICTION OVER ANY DISPUTES THAT ARISE HEREUNDER OR AFTER THE CLOSING.

16.5 Recordation. Purchaser shall not record this Agreement or a memorandum or other notice thereof in any public office without the express written consent of Seller. A breach by Purchaser of this covenant shall constitute a material default by Purchaser under this Agreement.

16.6 Section Headings. The Section headings contained in this Agreement are for convenience only and shall in no way enlarge or limit the scope or meaning of the various and several Sections hereof.

16.7 Further Assurances. Purchaser and Seller agree to execute all documents and instruments reasonably required in order to consummate the purchase and sale herein contemplated.

16.8 Severability. If any portion of this Agreement is held to be unenforceable by a court of competent jurisdiction, the court shall replace such unenforceable provision with a new

provision which shall be as close to the original unenforceable provision as possible. Nevertheless, the remainder of this Agreement shall remain in full force and effect.

16.9    Waiver of Trial by Jury. Seller and Purchaser, to the extent they may legally do so, hereby expressly waive any right to trial by jury of any claim, demand, action, cause of action, or proceeding arising under or with respect to this Agreement, or in any way connected with, or related to, or incidental to, the dealings of the parties hereto with respect to this Agreement or the transactions related hereto or thereto, in each case whether now existing or hereafter arising, and irrespective of whether sounding in contract, tort, or otherwise. To the extent they may legally do so, Seller and Purchaser hereby agree that any such claim, demand, action, cause of action, or proceeding shall be decided by a court trial without a jury and that any party hereto may file an original counterpart or a copy of this Section with any court as written evidence of the consent of the other party or parties hereto to waiver of its or their right to trial by jury.

16.10    Independent Counsel. Purchaser and Seller each acknowledge that: (a) they have been represented by independent counsel in connection with this Agreement; (b) they have executed this Agreement with the advice of such counsel; and (c) this Agreement is the result of negotiations between the parties hereto and the advice and assistance of their respective counsel.

16.11    Governmental Approvals. Subject to the approval of the Bankruptcy Court, Purchaser shall have the right to make such applications as Purchaser deems necessary to the applicable governmental bodies for approvals consistent with the provisions of this Agreement.

16.12    No Waiver. No covenant, term or condition of this Agreement other than as expressly set forth herein shall be deemed to have been waived by Seller or Purchaser unless such waiver is in writing and executed by Seller or Purchaser, as the case may be.

16.13    Mutual Cooperation. The parties acknowledge that the Seller has filed the Bankruptcy Case and that the various actions to be taken by the Seller herein are ultimately subject to the approval of the Bankruptcy Court. The parties agree to jointly cooperate in the preparation of the Plan and other matters in the Bankruptcy Case in order to facilitate the transactions as contemplated by this Agreement.

16.14    **COAL NOTICE.** THIS DOCUMENT MAY NOT SELL, CONVEY, TRANSFER, INCLUDE OR INSURE THE TITLE TO THE COAL AND RIGHTS OF SUPPORT UNDERNEATH THE SURFACE LAND DESCRIBED OR REFERRED TO HEREIN, AND THE OWNER OR OWNERS OF SUCH COAL MAY HAVE THE COMPLETE LEGAL RIGHT TO REMOVE ALL SUCH COAL AND IN THAT CONNECTION, DAMAGE MAY RESULT TO THE SURFACE OF THE LAND AND ANY HOUSE, BUILDING OR OTHER STRUCTURE ON OR IN SUCH LAND. (This notice is set forth in the manner provided in Section 1 of the Act of July 17, 1957, P.L. 984.).

16.15    OFAC Compliance. Purchaser hereby represents and warrants that Purchaser is in compliance with the requirements of Executive Order No. 13224, 66 Fed. Reg. 49079 (Sept. 23, 2001) (the "**Order**") and other similar requirements contained in the rules and regulations of the Office of Foreign Assets Control, Department of the Treasury ("**OFAC**"), and in any enabling

14

legislation or other Executive Orders or regulations in respect thereof (the Order and such other rules, regulations, legislation, or orders are collectively called the **"Orders"**). Further, Purchaser covenants and agrees to make its policies, procedures and practices regarding compliance with the Orders, if any, available to Seller for its review and inspection during normal business hours and upon reasonable prior notice.

16.16 Confidentiality. The terms contained in this Agreement shall be kept strictly confidential by the parties, except (i) for consultation with either party's respective legal counsel, accountants and/or consultants, or (ii) as required by applicable law or any governmental authority in connection with the transaction referenced herein. Any disclosure to permitted third parties as listed in subparagraph (i) hereinabove shall indicate that the information is confidential and should be so treated by the third party.

16.17 Publicity and Public Statements. No press release or other public communications may be made by either party unless and until both parties have consented in writing to the same.

16.18 Fully Integrated Document. This Agreement, and the Exhibits attached hereto, represent a fully integrated document. This Agreement may not be modified orally, but may only be modified by a writing signed by both the Seller and the Purchaser.

16.19 Not a Successor. Purchaser is not, and shall not be deemed to be, a successor to Seller and shall not have any "successor liability" under any federal, state or common law or any other theory, and the Seller shall request that the Court so find in the Order Confirming the Plan for the following: (i) any liability arising out of or relating to any employee benefit plan for which Seller is liable, if any, or otherwise relating to the employment or engagement of any past or present employee or consultant of Seller; (ii) any liability arising out of or relating to any proceeding (including, without limitation, all proceedings relating to tax liabilities) involving Seller or the Assets (whether or not such proceeding is pending, threatened or asserted before, on or after the Closing Date); (iii) any liability of Seller or related to the Assets, for any debt secured by a lien or any other interest in the Assets, whether accrued now or hereafter, whether fixed or contingent, whether known or unknown; or (iv) any liability arising under or relating to any contract, agreement, commitment or any other obligation of Seller to any third party, whether oral or in writing upon which a third party asserts a claim against Purchaser under a theory of successor liability (the "Excluded Liabilities"). Seller shall indemnify, defend and hold Purchaser, its affiliates, successors and assigns harmless from and against any loss, cost, expense liability or damages arising out of or related to the Excluded Liabilities. The terms, conditions and obligations set forth in this Section 16.19 shall survive Closing. Anything to the contrary notwithstanding, the terms of this Section 16.19 shall not and shall not be interpreted to in any way modify, limit, reduce or waive the provisions of Section 7 above.

IN WITNESS WHEREOF, the parties hereto have caused these presents to be made as of the Execution Date.

**SELLER**:
PITTSBURGH ATHLETIC ASSOCIATION, a Pennsylvania non-profit corporation.

By: *(signature)*
Name: JAMES A. SHEEHAN
Its: PRESIDENT - PAA

PITTSBURGH ATHLETIC ASSOCIATION LAND COMPANY, a Pennsylvania corporation.

By: *(signature)*
Name: JAMES A. SHEEHAN
Its: PRESIDENT - PAA.

**PURCHASER**:

WALNUT PAA, LP, a Pennsylvania limited partnership

By: *(signature)*
Name: Todd E. Reuter
Its: President of GP

16

BANK_FIN 576562-1 032279-180169

## EXHIBIT A

## LEGAL DESCRIPTION

ALL THAT CERTAIN property located in the 4th Ward of the City of Pittsburgh, designated in the Allegheny County Office of Deed Registry as Block and Lot. 27-R-110, also known as 5126 – 5130 Bigelow Boulevard, Pittsburgh, PA 15213.

ALL THAT CERTAIN property located in the 4th Ward of the City of Pittsburgh, designated in the Allegheny County Office of Deed Registry as Block and Lot. 27-R-138, also known as 4215 Fifth Avenue, Pittsburgh, PA 15213.

Case 17-22222-JAD Doc 419-3 Filed 12/22/17 Entered 12/22/17 21:24:50 Desc
Exhibit C - Purchase & Sale Agreement Page 19 of 19